UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALLOON LAKE DISTRIBUTION, LLC, et al.,

        Plaintiffs,

v.

INCIPIO TECHNOLOGIES, INC., et al.,

        Defendants.

                             /

Case No. 16-12350

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO DISMISS CERTAIN OF DEFENDANTS/COUNTERCLAIMANTS' COUNTERCLAIMS [21]**

This matter is before the Court on Plaintiffs/Counterclaim-Defendants' ("Plaintiffs") motion to dismiss certain of Defendants/Counterclaimants' ("Defendants")[1] counterclaims. (Docket 21.) Defendants filed a response (dkt. 29), and Plaintiffs filed a Reply (dkt. 39). Plaintiffs initially brought this action claiming breach of contract and breach of a promissory note, and seeking declaratory judgment. (Am. Compl., dkt. 10.) Defendants filed counterclaims alleging breach of contract (Count I), common law conversion under California law, or, in the alternative, statutory conversion under Michigan law (Count II), and violation of the California Uniform Trade Secrets Act, or, in the alternative, violation of the Michigan Uniform Trade Secrets Act (Count III). (Countercl., Dkt. 14.) The Court heard this matter on January 18, 2017.

---

[1] For ease of identification herein, the Court will refer to Defendant-Counterclaimant Incipio Technologies, Inc., together with Defendant-Counterclaimant Incipio LLC as "Defendants," despite their posture in this motion as being that of counterclaimants.

## I.  PARTIES AND PROCEDURAL HISTORY

Plaintiffs are Walloon Lake Distribution, LLC ("Walloon") and CCWU, LLC f/k/a ClamCase, LLC ("ClamCase"). Plaintiffs originally brought suit against Defendant Incipio Technologies, Inc. ("Incipio"), on June 23, 2016. (Dkt. 1.) Plaintiffs filed their motion to dismiss on October 31, 2016. (Dkt. 21.) On December 27, 2016, the Court entered a stipulated order (dkt. 41) joining the following additional parties: Incipio LLC[2] as defendant/counterclaimant; and Anthony Ahee ("Ahee"), John Schoenith, Charles J. Thomas, III ("Thomas"), and MJK (US) Electronic Investments, Inc. ("MJK", together "Counterclaim-Defendants") as Counterclaim-Defendants[3].

## II.  FACTS

ClamCase was in the business of designing, developing and selling tablet keyboard cases. (Countercl. ¶ 8.) On June 4, 2015, Incipio entered into an Asset Purchase Agreement ("APA") with ClamCase and ClamCase Members (together, "Sellers"). (Countercl. ¶ 8.) Under the APA, Incipio was to acquire the "Transferred Assets," defined as "all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible or intangible, of every kind or description." (Countercl. ¶ 8.) The

---

[2]Incipio LLC is an assignee of Incipio Technology's rights under the asset purchase agreement and escrow agreement at issue.

[3]  The Court has jurisdiction under 28 U.S.C. § 1332. Plaintiff Walloon is a Michigan limited liability company with its principal place of business in Detroit, Michigan, and its members are Ahee and John Schoenith, both residents of the state of Michigan. (Am. Compl. 1.) Plaintiff ClamCase is a Michigan limited liability company with its principal place of business in Grosse Pointe Farms, Michigan. (Am. Compl. 2.) ClamCase's members are Ahee, John Schoenith, and Thomas, residents of Michigan, and MJK, a Nevada corporation with its principal place of business in Toronto, Ontario. (Am. Compl. 2.) Defendants are Delaware limited liability corporations with principal places of business in Irvine, California. (Countercl. ¶¶ 3, 4.)

APA also provided for the parties to enter into an Escrow Agreement, pursuant to which Incipio deposited $1,000,000 of the purchase price into escrow with Citibank, N.A. The escrow was to be held to secure Incipio's right to indemnification under the APA in the event that Incipio made a post-closing claim under the APA and Escrow Agreement. (Countercl. ¶ 9; APA section 9.2.)

Nearly one year later, on May 26, 2016, Incipio delivered a claim notice under the Escrow Agreement. (Countercl. ¶ 10.) The claim notice arises from the actions of Stephen Schoenith, which, according to Defendants, constituted unauthorized access and misappropriation of Incipio's proprietary data and other information, including files and records of ClamCase executives and employees. (Countercl. ¶ 11.) Defendants allege that Stephen Schoenith is related to ClamCase member John Schoenith, that John hired Stephen to work for ClamCase, and that John made arrangements for Stephen to continue to provide services to Incipio after its acquisition of ClamCase. (Countercl. ¶ 12.)

Defendants call Stephen one of the "inner circle" of ClamCase. (Countercl. ¶ 14.) The APA identifies Stephen Schoenith as ClamCase's Vice President of Technology and Web Services. (Countercl. ¶ 14, citing APA, Schedule 3.24(a)(I).) Defendants also allege that he is one of a group of four ClamCase "insiders." (Countercl. ¶ 14, citing APA, Schedule 3.25(a).) Defendants allege that the inclusion of Stephen Schoenith in this manner is an admission by the sellers that at the time of the APA, Stephen was within an inner circle of ClamCase that consisted of "members, officers, directors or managers of the Seller or persons under control of a member, officer, director or manager of the Seller." (Countercl. ¶ 14, citing APA, Section 3.25 and Schedule 3.25(a).) The APA also identifies Stephen Schoenith by name as one of a limited group of people whose knowledge would be

attributed to the Sellers for the purposes of the Sellers' Knowledge definition in the APA. (Countercl. ¶ 14, citing APA Section 1.1.)

On or about June 20, 2015, shortly after entering into the APA, John Schoenith set up a consulting contract by which Stephen Schoenith would provide consulting services to Incipio through a third-party consulting service called Upwork. (Countercl. ¶ 16.) While Stephen consulted for Incipio, he continued to stay in communication with members of what Defendants describe as the ClamCase "inner circle," including John Schoenith and Ahee, who were allegedly making plans to revive the ClamCase team for a new project. (Countercl. ¶ 17.) On June 26, 2015, Stephen Schoenith participated in a Skype conversation with a former ClamCase colleague, Lowell Ahee. Stephen described to Lowell as follows an invitation that Stephen had received from John Schoenith to work on a new project: "john asked me a while ago like would you want to work with me on a new project later on? I'm like it depends what happens." (Countercl. ¶ 17.) On November 16, 2015, Stephen communicated via Skype with Tusher Garach, a former ClamCase industrial designer, as follows: "John has some stuff in the works that he might be trying to ge[sic] the team back together." (Countercl. ¶ 17.)

Defendants then allege that in the fall of 2015, Stephen Schoenith engaged in a series of steps to obtain information from Incipio that consisted of the Google business files of eleven key ClamCase individuals. (Countercl. ¶ 18.) These authorized ClamCase users had been provided a Google for Business account, a cloud-based platform, through which to conduct ClamCase business. (Countercl. ¶ 18.) The information consisted of emails and attachments, files where documents were stored, contacts and calendars. Defendants further allege that the Google for Business platform continued to be used after Incipio's

acquisition of the ClamCase business and that the files of these eleven individuals would have unique usefulness in getting the ClamCase team back together, if the files could be secreted out of Incipio. (Countercl. ¶ 18.)

On November 5, 2015, Stephen Schoenith opened an account with a service called "Backupify," a cloud-based service provider that allows users to perform backups of data and information. (Countercl. ¶ 19.) Defendants allege that the Backupify account provided Stephen Schoenith with the ability to copy information from the ClamCase accounts on the Incipio system to a location outside Incipio's password protected system, thus allowing him to access the information after he left Incipio. (Countercl. ¶ 19.) Stephen did not seek Incipio's permission to open the account and back up the information, nor was Incipio aware of these actions when they occurred. (Countercl. ¶ 19.) When Stephen opened the Backupify account, he identified himself as the subscriber/user, he used his personal credit card to pay for it, and he used his home address as the account's billing address. (Countercl. ¶ 19.)

From November 5 to November 6, 2015, Stephen Schoenith uploaded eleven ClamCase Google for Business accounts to Backupify. (Countercl. ¶ 20.) On November 6, 2015, Stephen notified Incipio that he was resigning with two weeks' notice. (Countercl. ¶ 22.) On November 12, 2015, he used Backupify to execute a full-service export of the Google Business Applications of at least ten former ClamCase executives and employees. (Countercl. ¶ 23.) The exported information included all information and data stored in these executives' and employees' Gmail, Google Drive, Google Calendar and Google Contacts applications. (Countercl. ¶ 23.) By doing so, the export application prepared a zip file of the complete Google account. (Countercl. ¶ 24.) Defendants further allege that all of

this information and data was acquired by Incipio in its ClamCase acquisition and remains the property of Incipio. (Countercl. ¶ 24.)

On November 16, 2015, Stephen Schoenith was notified that his employment was terminated as of that day. (Countercl. ¶ 25.) As part of Incipio's normal termination process, Stephen's supervisor, Kevin Suda, Incipio Director of Technology, took control of Stephen's ClamCase Google account including the email account, changed the login credential and password for those accounts, and created an email instruction to automatically forward incoming messages directed to Schoenith's email inbox directly to Suda's inbox. (Countercl. ¶ 25.)

Upon being notified that he was being terminated, Stephen Schoenith attempted to log into his Backupify account via his ClamCase Google account, unaware that the Google account password had been changed. (Countercl. ¶ 26.) Stephen's multiple unsuccessful attempts at logging in caused the Backupify administrator to generate an email to Stephen's ClamCase email address to notify him of the excessive number of sign-in attempts, as well as the locking of his account in response. (Countercl. ¶ 26.) Stephen did not received the email; it was redirected to Suda and was the first knowledge Incipio had of Stephen Schoenith's Backupify account.  (Countercl. ¶¶ 25, 26.)

Unable to access his accounts, Stephen Schoenith contacted Suda to request access to his accounts for the purpose of retrieving personal information. (Countercl. ¶ 26.) Suda advised Schoenith via Skype that due to company policy, a former employee cannot have access to company information or accounts, and Suda advised that he would speak with the IT department to see if arrangements could be made to retrieve any of Schoenith's personal information. (Countercl. ¶ 27.) Stephen Schoenith then contacted Backupify to

request access to the Backupify account and persuaded Backupify technical support staff to allow him to bypass the Incipio Google login password, and allow Stephen to login to Backupify manually. (Countercl. ¶ 28.) The Backupify technician verified Stephen by the last four digits of the credit card number on file. (Countercl. ¶ 28.) Upon accessing the Backupify account, Schoenith used the manual log in access to export material out of Incipio's password protected system. (Countercl. ¶ 28.) The download file folder on the hard drive of Schoenith's laptop computer reflects a timestamp of November 16, 2015, in the date-created field for three zip files exported from the Backupify account. (Countercl. ¶ 28.)

When Suda contacted Backupify at 4:32 p.m. on the same date to notify Backupify that Stephen Schoenith should not have access to the Incipio information in the account, he learned that Schoenith had already been provided access to the account via a manual access procedure by bypassing the Incipio password. Suda then arranged for the account to be transferred to Incipio. (Countercl. ¶ 29.)

On November 19, just three days later, Stephen Schoenith communicated with John Schoenith via Skype and transferred an audit log export file from Backupify, which detailed administrative activity in the Backupify account and allowed John to see what trail had been left by Stephen Schoenith's activities in the account. (Countercl. ¶ 30.) Defendants further allege that while their investigation continues, Incipio has so far determined that its property was stolen, the property was transported by Stephen Schoenith to his laptop hard drive and he accessed the downloaded files on his hard drive on multiple occasions. (Countercl. ¶ 31.) Defendants allege that they no longer have exclusive possession and control of the ClamCase property Incipio acquired, the integrity of the information for which it paid value

7

in the APA has been compromised, and these actions are breaches of the APA. (Countercl. ¶ 32.)

## III.  LEGAL STANDARD

Plaintiffs bring this motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), alleging the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Sixth Circuit noted that under the United States Supreme Court's heightened pleading standard laid out in *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "a complaint only survives a motion to dismiss if it contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Estate of Barney v. PNC Bank, Nat'l Ass'n,* 714 F.3d 920 (6th Cir. 2013) (internal quotations and citations omitted). The court in *Estate of Barney* goes on to state that under *Iqbal*, "[a] claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (internal quotations and citations omitted). Furthermore, while the "plausibility standard is not akin to a 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Estate of Barney*, 714 F.3d at 924 (citing *Iqbal*, 556 U.S. at at 679; quoting Fed. R. Civ. P. 8(a)(2)). If the plaintiffs do "not nudge[ ] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.  Finally, the Court must keep in mind that "on a motion to dismiss, courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 555 (citation omitted).

"[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed.R.Civ.P. 10(c)). "A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336.  "In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Id.* at 335-36; *see also Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir.1999)(documents not attached to the pleadings may still be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiff's claim") (internal quotation marks and citations omitted); *Weiner v. Klais and Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (where the plaintiff referenced the "plan" numerous times in the complaint, the court could consider the plan documents along with the complaint; "they were incorporated through reference to the plaintiff's rights under the plans, and they are central to plaintiff's claims").

## IV.   ANALYSIS

### A.   Whether Defendants Have Alleged Sufficient Factual Matter to State A Claim For Breach Of The Asset Purchase Agreement (Countercl. Count I)

Plaintiffs first argue that Defendants failed to sufficiently state a claim for breach of the APA. To state a claim for breach of contract in Michigan, a claimant must allege: (1) a valid contract between the parties; (2) the terms of the contract; (3) that the defendants/counterclaim-defendants breached the terms of the contract; and (4) that the defendants/counterclaim-defendants' breach caused the injury to the claimant. *See Webster v. Edward Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999).

9

As an initial matter, Plaintiffs argue that the actions of Stephen Schoenith cannot be attributed to ClamCase or its members; Schoenith is not a party to this case. Yet Stephen Schoenith is identified in the APA as one of the individuals whose knowledge can be attributed to ClamCase and its Members. (Countercl. ¶ 14; APA sections 1.1, 3.25, Pl.'s Mot. Ex. A, dkt. 21-2.)  Section 1.1 of the APA defines "Knowledge of Seller" or "Seller's Knowledge" or "any other similar knowledge qualification" to mean, "with respect to Seller, the actual knowledge, after reasonable inquiry and investigation, of any Member, officer or director of Seller and shall include, without limitation, John Schoenith, Steve Schoenith, Anthony Ahee and Lowell Ahee." (APA § 1.1.)

Section 3.25 of the APA, addressing Affiliate Transactions, refers to the following as "Insiders": current or former members, officers, directors, or managers of Seller, and immediate family members of any of these persons. (APA section 3.25.) Stephen Schoenith is a past Vice President of Technology and Web Services at ClamCase. (Countercl. 14, citing APA, Schedule 3.24(a)(I).) In addition to the knowledge provision of the APA, Defendants make specific allegations from which a reasonable inference could be drawn that John Schoenith had actual knowledge of, acted in concert with, or directed Stephen Schoenith's actions. These allegations include not simply Stephen's report that John might be getting "the team back together", but the alleged role John Schoenith played in securing Stephen Schoenith's position at Incipio, as well as the proximity in time between Stephen taking Incipio data and files, and his subsequent communications with John Schoenith and the transfer of the Backupify account audit log export to John. (Countercl. ¶¶ 16, 17, 30.) Defendants have alleged enough from which to plausibly infer Stephen Schoenith's actions are related to a Member.

Plaintiffs acknowledge that Defendants allege breach of sections 2.1, 3.25, 3.3, 6.10 and 6.11 of the APA, yet argue that Defendants have not stated a breach of any of the APA provisions to which they cite. The Court may not look to extrinsic evidence or make a different agreement for the parties when the words of the contract are clear, unambiguous, and have definite meanings. *See UAW-GM Human Resource Center v. KSL Recreation Corp.*, 589 N.W.2d 411, 414 (Mich. App. 1998); *see also Rasheed v. Chrysler Corp*, 517 N.W.2d 19, 29 n.28 (Mich. 1994) (under Michigan law, the "primary goal in the construction or interpretation of any contract is to honor the intent of the parties"). "The initial question whether contract language is ambiguous is a question of law. If the contract language is clear and unambiguous, its meaning is a question of law." *Port Huron Ed. Ass'n v. Port Huron Area School Dist.*, 550 N.W.2d 228, 237 (Mich. 1996).

Plaintiffs argue that the APA does not cover the kind of information which Defendants allege was taken. Section 2.1 of the APA, Transfer of Assets, provides that

> Seller agrees to sell, assign, transfer, convey and deliver to Buyer, at the Closing, free and clear of all Liens, except Permitted Liens, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, whether now owned, leased, used or held for use, including, without limitation, the following (but excluding the Excluded Assets) (such property and assets shall be collectively referred to herein as the "Transferred Assets")

(APA, section 2.1, Pls.' Mot. Summ. J. Ex. A.) Section 2.1 goes on to specify types of assets, including "Books and Records," which is defined as "all records, documents, lists, notes and files relating to Seller, Seller's assets and properties and the Business, . . . including . . lists of accounts, customers, . . . computer files, programs and retrieved programs, . . . whether in hard copy, electronic form or otherwise." (APA, Art. 1, section 1.1.) This language is not ambiguous. The APA transferred assets provision encompasses

11

the electronic data which Defendants argue was the subject of Stephen Schoenith's actions: electronic records, documents, email, contact information, and calendar information of ClamCase's key personnel. (Countercl. ¶¶ 8, 11, 34, 40.)

Defendant also pleads a breach of Article 3, "Representations and Warranties of Seller," section 3.19, "Intellectual Property." This provision is a covenant to transfer intellectual property to Defendant/Buyer as part of the APA. Defendants have made sufficient allegations from which a reasonable inference may be drawn that this transfer was illusory, where files or assets may have been deleted and/or transferred outside the Incipio system via Stephen Schoenith's Backupify account. (Countercl. ¶¶ 8, 11, 21, 34, 40.)

Section 3.25 provides that except as set forth in the disclosure schedule, "no member, officer, director or manager of Seller, nor any Person under the control of a member, officer, director or manager of Seller, has any agreement, arrangement or understandings with Seller." (APA section 3.25.) Further, as discussed above, no "current or former member, officer, director, or manager (sic) Seller, nor any immediate family member of any of the foregoing (all of the foregoing Persons, collectively, "Insiders"): (i) has any ownership interest in any Transferred Assets; . . . (iv) is a party to any Contract or ongoing transaction or business relationship with, or has any claim of right against, Seller." (APA section 3.25.) Section 3.30 is a full disclosure provision, stating that no representation or warranty by Seller in the APA "contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading." (APA section 3.30.)

Contrary to Plaintiffs' argument, the Court finds that Defendants have pled sufficient

facts from which a reasonable inference may be drawn that Stephen Schoenith is an

Insider or otherwise under the control of John Schoenith and may be a party to an ongoing

business relationship or business venture with ClamCase members, which, as Defendants

allege, gave rise to the misappropriation of ClamCase property, a transferred asset. For

example, Defendants allege that John Schoenith set up the position for Stephen Schoenith

to work for Incipio following the transfer of ClamCase business and assets. (Countercl. ¶¶

16, 17.) Plaintiffs' arguments to the contrary regarding the circumstances of Stephen

Schoenith's employment or contractual positions with ClamCase and then Incipio do not

negate the plausibility of Defendants' allegations. "Ferreting out the most likely reason for

the defendants' [or counterdefendants'] actions is not appropriate at the pleadings stage."

*Watson Carpet & Floor Covering, Inc. v. Mohawk Industries, Inc.*, 648 F.3d 452, 458 (6th

Cir. 2011) (reversing dismissal of complaint in an antitrust case where the defendant

provided alternative explanations for the plaintiff's allegations; "to survive a motion to

dismiss, [the defendant] needs to allege only that the defendants' agreement *plausibly*

explains the refusals to sell, not that the agreement is the *probable* or exclusive

explanation. *Id.* at 454); *see also Iqbal*, 556 U.S. at 678 ("[T]he plausibility standard is not

akin to a 'probability requirement.'").

Sections 6.10 and 6.11 of the APA address post-closing conduct. Section 6.10, under

Article 6 "Covenants," addresses non-competition, non-solicitation and non-disparagement,

providing in part,

> For a period of three (3) years commencing on the Closing Date . . . , Seller
> and each Member shall not, and shall not permit any of their respective
> Affiliates to, directly or indirectly: (i) engage in, or assist others in engaging
> (whether through employment, consultation, advisory services, . . . or by any
> financial or other investment) in the Prohibited Business in the Territory; (ii)

13

have an interest in any Person that engages directly or indirectly in the Prohibited Business in the Territory in any capacity, . . . ; or (iii) cause, induce or encourage any actual or prospective client, customer, supplier, licensee, licensor or distributor of Seller, Buyer or the Business, . . . or any other Person who has a material business relationship with Buyer or the Business, to terminate or modify any such actual or prospective relationship.

(APA section 6.10.) This provision places further restrictions during the three-year period on Seller or Members hiring or soliciting Buyer's (Defendants') employees, or soliciting clients, customers, suppliers and others of Buyer.  (APA section 6.10.)

Section 6.11, "Post-Closing Confidentiality," requires that Plaintiffs, as Sellers and Members, "hold in confidence any and all confidential, proprietary and non-public information and materials, whether in written, verbal, graphic or other form, concerning Buyer, the Business or the Transferred Assets (collectively, "Business Confidential Information)," with the exception of any information that becomes public other than by a breach by Seller or any Member. (APA section 6.11(a).) Further, Seller, Members and their respective Affiliates shall not "use any Business Confidential  Information except as expressly authorized in writing by Buyer." (APA section 6.11(b).)

Defendants have specifically plead that Stephen Schoenith took Business Confidential Information without Incipio's assent. (Countercl. ¶ 19, 23, 24, 31, 32, 40.) Further, they have pled facts from which a plausible inference could be made that Stephen Schoenith acted in concert with at least one Member, John Schoenith. (Countercl. ¶ 16, 17, 30.) The Court will deny Plaintiffs' motion to dismiss as to the breach of contract claims.

14

**B. Whether Defendants Have Alleged Sufficient Factual Matter to State A Claim For Conversion (Countercl. Count II)**

Plaintiffs argue that Defendants cannot assert a conversion claim at the same time as they assert a claim under the Michigan Uniform Trade Secrets Act (MUTSA) or the California Uniform Trade Secrets Act (CUTSA). Plaintiffs argue that MUTSA "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Mich. Comp. Laws Ann. § 445.1908(1). Yet some courts, including in this district, have made the distinction that claims under Michigan law are not preempted by MUTSA where the claims "are not based *solely* on trade secrets." *American Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 869, 884 (E.D. Mich. 2015) ("The critical inquiry for courts in determining whether a claim is displaced by the MUTSA is whether the claim in question is based *solely* on the misappropriation of a trade secret" (citing *Dura Global Techn., Inc. v. Magna Donnelly Corp.*, No. 07-10945, 2009 WL 3032594, at *3 (E.D. Mich. Sept. 18, 2009)). MUTSA does not preempt "[o]ther civil remedies that are not based upon misappropriation of a trade secret." Mich. Comp. Laws Ann. § 445.1908(2)(b). Here, Defendants' allegations support a cause of action for breach of contract, and, as Defendants point out, the conversion claim is not based entirely on trade secrets, as some of the property at issue does not rise to the level of a trade secret. *See McKesson Med.-Surgical Inc. v. Micro Bio-Medics, Inc.,* 266 F. Supp. 2d 590, 600 (E.D. Mich. 2003) ("MUTSA only preempts other civil remedies that involve trade secrets," noting that the plaintiff's claims were "based not only on trade secrets, but also other confidential information").

Plaintiffs rely on cases which noted that the fact that the parties disputed whether the

information was trade secret did not preclude the court from finding that the tort claims were displaced. *See e.g., Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943 (W.D. Mich. 2003). The *Bliss Clearing* court concluded that

> [T]he disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the MUTSA. Because the purpose of the UTSA is "to preserve a single tort cause of action under state law for misappropriation ... and thus to eliminate other tort causes of action founded on allegations of trade secret misappropriation," allowing otherwise displaced tort claims to proceed on the basis that the information may not rise to the level of a trade secret would defeat the purpose of the UTSA. Thus, "[u]nless [Midwest] misappropriated a (statutory) trade secret, [it] did no legal wrong."

*Id.* at 948-49 (internal citations omitted).

Defendants identify the loss of "electronic records, documents, email, contact information and calendar information of ClamCase's key personnel," some of which Defendants readily admit does not rise to the level of a trade secret. (Countercl. 23, 48; Defs.' Resp. 20.) Here, even as the Court looks beyond Defendants' characterization of the data and information to the substance of their allegations, Defendants' claims are much more like those of *American Furukawa, Inc.*, a 2015 case from this district, than *Bliss Clearing*. In *American Furukawa*, the plaintiff alleged "a proper claim for conversion" where the defendant took over 1,500 files and two and a half years of email from the plaintiff's "exchange server and placed the information on his external hard drive." *American Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d at 886.  The *Furukawa* court held that MUTSA did not preempt the plaintiff's other claims, including the conversion claim, where the claims were not "solely based on misappropriation of a trade secret." *Id.* at 884 (citation omitted); *see also Ikon Office Solutions, Inc. v. Rezente*, No. CIV. 2:10-1704 WBS KJM, 2010 WL 5129293, at *3-4 (E.D. Cal. Dec. 9, 2010) (CUTSA did not preempt claims that arose from

"facts different from the claim of misappropriation of trade secrets" or based on "a distinct fact" from the nucleus of facts comprising the misappropriation of trade secrets claim).

Next, Plaintiffs argue that Defendants failed to state a claim for conversion. Michigan law provides that conversion is "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." *Aroma Wines & Equip., Inc. v. Columbian Distr. Servs., Inc.*, 871 N.W.2d 136, 141 (Mich. 2015); *see also* Mich. Comp. Laws Ann. § 600.2919a (statutory remedy for conversion). Under California law, "[a]ny act of dominion wrongfully exerted over the personal property of another inconsistent with the owner's rights thereto constitutes conversion." *Plummer v. Day/Eisenberg, LLP*, 108 Cal. Rptr. 3d 455, 464 (Cal. Ct. App. 2010). The elements under California law are (1) the plaintiff/counterclaimant's "ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *See Lee v. Hanley*, 354 P.3d 334, 344 (Cal. 2015).

Similar to the breach of contract claims, Plaintiffs argue that Defendants failed to tie Stephen Schoenith's actions to ClamCase or its Members. (Pls.' Br. Summ. J. 18.) As set forth above, Defendants have adequately alleged that Stephen Schoenith was acting on behalf of at least one ClamCase Member. (Countercl. ¶ 11,12, 14-17, 21, 30.) To the extent that Plaintiffs also argue that Schoenith was unsuccessful in taking Defendants' information, Defendants have alleged adequate facts from which to find that Stephen Schoenith successfully exported Incipio's information to Backupify, and from there to his personal laptop, a location beyond Incipio's control. (Countercl. ¶ 23, 24, 28, 29, 31, 32.) The Court denies Plaintiffs' motion to dismiss as to Defendants' conversion claim.

**C.  Whether Defendants Have Alleged Sufficient Factual Matter to State A Claim**

17

**For Trade Secret Theft: Violation of California and/or Michigan Uniform Trade Secrets Act (Countercl. Count III)**

Finally, Plaintiffs argue that Defendants have not identified with specificity what "trade secrets" were allegedly stolen, other than a generalized allegation and, again, that Defendants have failed to properly allege that Stephen Schoenith's actions are attributable to ClamCase. The latter argument is addressed above and the Court finds that Defendants have adequately alleged that Stephen Schoenith's actions were taken in concert with at least one ClamCase Member, John Schoenith.

MUTSA defines Trade Secret as

[I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws Ann. § 445.1902(d). The California code is substantively the same. *See* Cal. Civ. Code § 3426.1(d).

Defendants respond that they have identified the trade secrets with the level of specificity required at this stage in litigation. They argue that Incipio's contact information and the calendar information of key ClamCase personnel has independent economic value from not being widely known. They also point out that Incipio made efforts to protect this data from public disclosure by bargaining for confidentiality provisions in the APA, and further protecting the information by password protection. (Countercl. ¶¶ 25, 49-50) Stephen Schoenith took elaborate steps to export the data into his control, such steps

appearing calculated in their close proximity to both his resignation and his subsequent termination. (Countercl. ¶¶ 19-20, 23-30.) Defendants also allege that there may be plans to use the data in getting the former team back together and working on a new project. (Countercl. ¶¶ 18, 37, 44, 52.) Finally, Defendants argue that they should have the opportunity to conduct more discovery to determine to what actual use ClamCase and its Members put the information. The Court finds that Defendants have met the pleading standards to avoid dismissal of their trade secret claims.

## V. CONCLUSION

For the reasons set forth above the Court DENIES Plaintiffs' motion to dismiss (dkt. 21).

**SO ORDERED.**

          s/Nancy G. Edmunds
          Nancy G. Edmunds
          United States District Judge


Dated:  March 6, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 6, 2017, by electronic and/or ordinary mail.

          s/Carol J. Bethel
          Case Manager